Filed 6/27/13  In re A.D. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| In re A.D. et al., Persons Coming Under the Juvenile Court Law. | |
| NEVADA COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. T.D., Defendant and Appellant. | C072683 (Super. Ct. Nos. J9178, J9179) |

T.D., mother of the minors, A.D. and K.D., appeals from orders of the juvenile court terminating her parental rights.  (Welf. & Inst. Code, §§ 366.26, 395; unless otherwise stated, statutory references that follow are to the Welfare and Institutions Code.)  Appellant, limiting her arguments to K.D., contends the court erred in failing to find she had established the beneficial relationship exception to the preference for adoption and failed to comply with the notice provisions of the Indian Child Welfare Act

1

(ICWA) (25 U.S.C. 1901 et seq.).  We reverse for compliance with the notice provisions of ICWA as to K.D. and affirm the orders as to A.D.

FACTS AND PROCEEDINGS

The minors, eight-year-old A.D. and five-year-old K.D., were placed in protective custody pursuant to a warrant in December 2011 after police found the minors and appellant in a home where marijuana was accessible to the minors.  When A.D. was interviewed he disclosed he was subject to significant physical abuse by appellant's former boyfriend.  After being placed in a foster home, A.D. told the social worker he did not miss appellant and did not want to go home.  K.D. said he did miss appellant a little and that the former boyfriend and the mother spanked them.

Initially, appellant had twice weekly supervised visits with the minors.  At a visit in February 2012, A.D. sought reassurance that appellant would be nice when they came home.  In a visit in March 2012, the minors reminded appellant of a violent incident between her and a boyfriend.  Appellant deflected the issue and minimized the incident. At some visits K.D. told appellant how much he loved her, at others he ignored her and did not respond when she spoke to him.

The disposition report stated that K.D.'s father, Clay G. reported that his maternal grandmother Margaret M., told him there was Choctaw heritage in the family and he believed he could be 1/16th Choctaw.  He was not in contact with the paternal grandmother or his great-grandmother and did not know how to contact either.  He said his mother, Judith M. was born in Kansas.

At the contested disposition hearing in April 2012, counsel for K.D.'s father Clay G. raised the question of the status of his Indian heritage and was told the agency was waiting for Clay G. to complete the Indian heritage form.  The court, relying on *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, concluded that the information Clay G. had provided constituted a bare suggestion that K.D. was an Indian child and was insufficient

2

to trigger the notice requirements of ICWA. After further hearing, in May 2012, the court denied services to appellant and set a section 366.26 hearing to select a permanent plan for the minors. The court reduced visits to twice a month pending the hearing. Appellant cancelled her scheduled visit after the disposition hearing.

The report for the section 366.26 hearing stated the minors were generally healthy and developmentally on target. A.D. was somewhat behind in school due, in part, to trauma and to his prior lack of stability. Both minors were in therapy. Appellant attended the twice monthly visits. With the decrease in visit frequency, the minors no longer had negative reactions to visits and appeared to enjoy their contact with appellant. K.D. said that appellant brought "lots of toys and stuff to eat." The report concluded that the minors had an unstable and chaotic childhood marked by severe abuse by appellant's boyfriend. The majority of the abuse was directed at A.D. whose emotional health was severely impacted resulting in both physical and psychological issues. K.D. appeared to be less affected by the abuse and instability but was not comfortable talking about that period to interviewers, because what appellant's boyfriend had done to him was embarrassing for him to talk about. Both minors needed permanency and stability which, in the social worker's opinion, was best achieved by termination of parental rights and adoption.

In October 2012, the court ordered a relationship study to address the factors relevant to the beneficial relationship exception to termination of parental rights. The study, performed by Dr. Roeder, included interviews of appellant and each minor, review of reports and visit records and an observation of the interaction between appellant and the minors. The study concluded there was a parent-child relationship between the minors and appellant. K.D. also had a positive emotional attachment to appellant although A.D. did not. It was clear that A.D. would not be greatly harmed if parental rights were terminated. The question was closer with K.D. because he did "kind of miss" appellant and wanted to return to her. However, Dr. Roeder concluded "it cannot be said

3

to a reasonable degree of certainty that K.D. would be greatly harmed if his relationship with his mother were terminated." Thus, an ongoing relationship with appellant would not promote K.D.'s well-being to the extent that it would outweigh the benefits of a permanent adoptive home.

At the contested section 366.26 hearing, Dr. Roeder's testimony was consistent with his report. He stated that K.D.'s desire to return to appellant was genuine and deeply felt and characterized K.D.'s attachment to appellant as partial to positive. Dr. Roeder opined that K.D. did appear to have a positive emotional attachment to appellant but it was a close call on whether he would be harmed if parental rights were terminated. He was unable to say with certainty that K.D. would be greatly harmed by termination of parental rights but acknowledged there would be some harm. The harm could be dealt with if K.D. was able to develop a secure attachment with the next parental figure and if he remained placed with A.D. Dr. Roeder had reviewed the visitation logs but observed that positive visits do not really provide much information about a child's attachment to the parent. Dr. Roeder explained that the benefit of a permanent home with adoptive parents was the consistency and stability which produces attachment, having needs met and a place the child can trust so the child can develop. The benefit to both minors of a permanent home with adoptive parents was clear.

Appellant also testified, primarily to correct statements by Dr. Roeder with which she disagreed. She also testified that the minors were happy to see her at every visit.

The court found the minors were likely to be adopted in a reasonable time. The court found Dr. Roeder's reasoning persuasive and that appellant had not met her burden to establish the beneficial relationship exception. The court concluded the minors deserved consistency, stability and permanence and terminated parental rights, selecting a permanent plan of adoption.

4

DISCUSSION

I

*The Beneficial Relationship Exception*

Appellant argues that the beneficial relationship exception was established and the court erred in terminating her parental rights.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) The party claiming the exception has the burden of establishing the existence of any circumstances which constitute an exception to termination of parental rights. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(4); Evid. Code, § 500.)

Termination of parental rights may be detrimental to the minor when: "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) However, the benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child

5

would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.) Even frequent and loving contact is not sufficient to establish this benefit absent a significant positive emotional attachment between parent and child. (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Brian R*. (1991) 2 Cal.App.4th 904, 924.)

The evidence showed the minors had a conflicted relationship with appellant. According to visitation records, the minors generally enjoyed the contact with appellant but sought reassurance that she would treat them better if they returned home. When the minors raised issues of past incidents of violence, appellant deflected their statements and minimized the incidents. Sometimes K.D. would express overwhelming love for appellant and other times would ignore her entirely. When the frequency of visits decreased, the minors' negative reactions to visits diminished. Overall, the limited supervised interactions were good. To some extent, K.D.'s enjoyment of visits appeared to stem from the fact that appellant brought "lots of toys and stuff to eat."

Dr. Roeder's bonding study reflected this conflict. Dr. Roeder reported that K.D. did like his foster placement and would "kind of" miss appellant. K.D. also said he wanted to go back to appellant. Dr. Roeder found there was a parent-child relationship between appellant and K.D. and K.D. had a positive emotional attachment to appellant but could not conclude that the relationship was so strong K.D. would be greatly harmed by its termination.

Both appellant and Dr. Roeder testified. The juvenile court assessed the credibility of the witnesses and resolved conflicts in the evidence adversely to appellant. (*In re Jason L*. (1990) 222 Cal.App.3d 1206, 1214.) We do not reweigh the evidence when assessing the sufficiency of the evidence. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.) Based on the reports of the minor's improving behavior as visitation was decreased, his ambivalent conduct over the course of the dependency and the conclusions of the bonding study, the evidence did not establish K.D. would be greatly harmed if

6

parental rights were terminated. The juvenile court did not err in concluding that the benefit to K.D. of a permanent and stable home outweighed the benefit of continued contact with appellant in a tenuous placement.

## II

### *The Indian Child Welfare Act*

Appellant contends the juvenile court erred in concluding that K.D.'s father, Clay G., had not provided enough information about the minor's possible Indian heritage to trigger the notice requirements of the ICWA. We agree.

The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. (25 U.S.C. §§ 1901, 1902, 1903(1), 1911(c), 1912.) If, after the petition is filed, the court "knows or has reason to know that an Indian child is involved," notice of the pending proceeding and the right to intervene must be sent to the tribe or the Bureau of Indian Affairs (BIA) if the tribal affiliation is not known. (25 U.S.C. § 1912; Welf. & Inst. Code, § 224.2; Cal. Rules of Court, rule 5.481(b).)

It is not necessary that the child's Indian status be certain to implicate the notice requirements of ICWA. (*In re Desiree F*. (2000) 83 Cal.App.4th 460, 471.) Relatively scant facts may be enough for one tribe to determine whether a child is eligible for tribal membership while another tribe may require an extensive genealogy and an identified blood percentage. It is the province of the tribe, not the court, to determine whether the child is eligible for membership in the tribe. (§ 224.3, subd. (e)(1).) Nonetheless, some information provided by a parent can be "too vague and speculative to give the juvenile court any reason to believe the minors might be Indian children." (*In re O.K.* (2003) 106 Cal.App.4th 152, 157.) In those cases, notice is not triggered. (See, e.g., *In re J.D*. (2010) 189 Cal.App.4th 118, 125 [paternal grandmother suggested possible Indian heritage, but no known tribe]; *In re Jeremiah G*., *supra*, 172 Cal.App.4th at pp. 1520-1521 [father's assertion, later retracted, of a possibility the great-great grandfather was

7

Indian, without naming a tribe was too vague]; *In re Aaron R.* (2005) 130 Cal.App.4th 697, 707 [grandmother's statement that she was a member of the Black Native American Association in Fort Point Presidio Historical Association fell far short of giving the court reason to know the minor might be Indian]; *In re O.K.*, *supra*, 106 Cal.App.4th at pp. 155-157 [grandmother's statement the minors may have Indian heritage because they were from "that section" with no identified tribe too vague]; *In re Levi U.* (2000) 78 Cal.App.4th 191, 194, 198 [paternal grandmother stated there might be Indian heritage on her mother's side but the tribe was unknown was too vague].) The elements these cases have in common is that no tribe is ever suggested by the person claiming Indian heritage and the claim is rooted in mere possibility.

The juvenile court, relying on *Jeremiah G.*, concluded the information provided in this case was too uncertain to trigger notice. However, the father said his maternal grandmother told him he had Choctaw heritage and he believed he was 1/16th Choctaw. Further, while he did not fill out the information form he was able to provide some ancestral information such as his mother's and his maternal grandmother's name. This is not a great wealth of information, but certainly exceeds the vague and incomplete information which has been found not to trigger notice. Notice of the proceedings should have been sent to the three federally recognized Choctaw tribes so that they could make a determination of whether the minors were eligible for membership in the tribe.

DISPOSITION

The orders terminating parental rights as to K.D. are reversed and the matter is remanded for the limited purpose of complying with the notice provisions of the ICWA by sending notice to the relevant tribes. Thereafter, if there is no response or if the tribe determines K.D. is not an Indian child, the orders shall be reinstated. However, if the tribe determines K.D. is an Indian child, the juvenile court is ordered to conduct a new section 366.26 hearing in conformance with all provisions of the ICWA.

8

No issues having been raised as to A.D., the orders terminating parental rights as to him are affirmed.

_____HULL_____, J.

We concur:

_____BLEASE_____, Acting P. J.

_____BUTZ_____, J.